They'll be here by the time we start it. So we'll start with the second case in the morning, Mr. Patel v. Wilson v. Specialized Loan Servicing. We'd be pleased to hear from you, Mr. Ronzetti. I just wanted to mention to the clerk that my time was 10 minutes. Thank you. Okay. And one other thing, I'd neglect to say this, but the tradition of our court is we've read the briefs. In many instances, we've looked at the record. We are familiar with the factual and procedural background, so you can go to the heart of the matter. Thank you, Your Honor, and may it please the court, I'm Tucker Ronzetti, and with me is Adam Oskowitz and Rachel Sullivan, and we represent borrowers in this case, these consolidated appeals. And the issue before the court is whether the filed rate doctrine prevents borrowers from having any remedy at all for the violation of their mortgage agreements, which have a requirement that if they're charged for insurance, after failing to maintain their insurance, they'll only be charged the cost of the insurance. And the answer to that question is no. There are two fundamental reasons. And the first goes to the nature of lender-placed insurance, and this is something that the district court below, both courts, frankly, which adopted Rothstein and the Rothstein court, the Second Circuit, failed to acknowledge perhaps because they didn't have the record built up in the Rothstein case. But lender-placed insurance is different from any other type of filed rate situation that's occurred in the past. It's unlike electricity. It's unlike your typical common carrier case. It's unlike a case involving telephones, because in that situation, the insurance product is an insurance product that is specifically for the lender or servicer and their portfolio. It is not the hazard insurance that all of us buy on a day-to-day basis. The first and most compelling reason why it's distinct is a statutory reason. Under Florida statutes and Pennsylvania statutes, lender-placed insurance is called collateral protection insurance, protecting the collateral for a lender, and the language specifically excludes residential insurance. So if you look at Florida Statute 624, 6085, Florida, 40, Pennsylvania Statutes 991, 1802, they both exclude this type of insurance from residential insurance, indicating that the state governments themselves are recognizing that these regulatory regimes are not intended to go all the way to the borrowers, so their rate setting will not implicate the remedies of those borrowers. And when you look at the actual insurance itself, the product itself, it's very clear that this is very different, and it's for the lender and not for the ultimate borrower. If you look at the amicus brief by property casualty on page 6, it lays it out very clearly. LPI is a commercial insurance product that can only be obtained by a lender or servicer through, in most cases, a master group property insurance policy issued by an LPI carrier. So in other words, ordinary borrowers cannot even get this type of insurance. Are not the rates themselves regulated by the state in just the same way? That is, there is a master policy that's filed, and the state approves it as with any other insurance product? There is a process of approval of the rates, Your Honor, but the approval of those rates is very different from hazard insurance that ordinary borrowers purchase. If we look at the policy, for instance, on the appendix in Fowler, it's there, Exhibit 6, starting at page 85, you'll see that it's called Mortgagee Interest Protection Program. This is what the people, the Florida regulators are seeing. They're not seeing hazard insurance. They're seeing Mortgagee Interest Protection Program. And the elements of the program, for instance, I'm looking at page 88 of the appendix, they examine eligible mortgages. They look at the amount that is charged or that is authorized in the filed rate is the amount that is passed on to your clients. Now, you're saying that that rate is hyperinflated. You use that term throughout both of the complaints, as I read them, use terms excessive charges, hyperinflated rates. Is that not correct? Two components to your question. First, Your Honor, yes, ASIC is taking that rate and charging it to the borrowers. But the second component, respectfully, I'd have to disagree with, because what we're looking at is not a challenge to the reasonableness of the rate. We're not attacking rates. We're attacking particular conduct in terms of commissions that are unearned and, in fact, kickbacks in terms of services that are provided below cost and the like. Am I wrong? I'm sorry, go ahead. No, please, please, go ahead. You're saying that the complaint repeatedly, perpetually uses terms of artificially inflated premiums, hyperinflated premiums, charges to the borrower. Yes, Your Honor. Are those not the terms that are used? Yes, Your Honor. We do refer to premiums that are excessively high. And ultimately, the dollar amount, the out-of-pocket or the charge to the borrower is a premium. That's true, Your Honor. But the conduct of the defendants is what we're looking at. We're not looking at the setting of the rates. There are a lot of cases. Yes, Your Honor. Your contention, as I understand the briefs, is that you are not challenging the approved rate itself but simply challenging whether or not that is a true cost that the lender has to pay for the insurance. Yes, Your Honor. Because we're challenging particular conduct that resulted in ASIC, in fact, passing on cash or in-kind to the lender or the servicer. And this is like Judge Boggs' colleague's decision in the Williams case in the Sixth Circuit where there was an attack based upon Duke Energy having preferential treatment side agreements for certain customers. The irony in this case, Your Honor, is that the rate payer here is the lender or the servicer, and they're not paying the rate, and yet they're trying to charge that rate to us. They're getting kickbacks. They're getting benefits in kind, and so effectively they're not paying the rate, and yet they're saying, we have to pay these rates, and it cannot be examined by a court of law. And the result of it, Your Honor, would be even if the regulations extended there, even if the statutes covered this and said residential properties are included and indicated that the regulators were going to be looking at this specifically as residential coverage, the irony is these borrowers will then have no remedy in court. What they're saying is you're out. You have no ability whatsoever. It is law, and it is an exclusion that will lead to no result. And the court, I think, in that context has to look very carefully at the regime, very carefully at what is being regulated, what is being passed upon. I mean, if we look at this product, the limitation of liabilities determined presumptively based upon the loan balance, not based upon the value of the home. That's on page 88. They calculate the rates based upon the loan portfolio on page 94. The quality of loan underwriting and the quality of the loan portfolio are what prices are set upon. Not anything like your residence, and that's stated in the amicus brief on page 6. Voluntary insurance policies, by contrast, very different from this product, are personal insurance products issued for a specific property and name the borrower as the primary insured. These lenders could have gone out into the market and gotten hazard insurance, could have gotten rated hazard insurance. That would be a very different case. But here we're talking about a product that is the Mortgagee Interest Protection Program. It's collateral. And so in that context, Your Honor, this is very much like the Alston case, and the court should depart from the Rothstein case because Rothstein, frankly, did not examine the nature of the product, did not examine the statute or the applicable statutes. Those simply were not before the court, or they did not make the opinion. And so the court should depart. Does your case have a stronger basis against the lender as against the insurance company, or do you think it's as strong as to both? Our case is primarily against the lender as opposed to the insurance company, Your Honor. But the filed rate doctrine has, in some context, been applied beyond the insurance company. Frankly, that has not been well developed. It seems to me like when you follow the law on the filed rate doctrine, it's really morphed, because originally it was about federal regulation. Then it came to govern state causes of action as well. And now in the most recent instance, it's gone to this ABC context. And most recently, an ABC context where you don't have a wholesaler, a retailer, and a consumer, but now in a product that is basically a separate and independent product, and then a consumer that isn't really a consumer but somebody who's charged money and has a duty of reimbursement. My question was a little bit different, and I'm sorry I didn't get it across correctly. The insurance company is not precluded by any notion that I can think of from giving back a rebate to the lender if it so chooses to continue getting the lender's business, right? That doesn't cause, in and of itself, that doesn't cause you any harm, a borrower any harm whatsoever. That's absolutely right, Your Honor. And so my question is whether you think that your argument applies, taking it on its terms, applies as strongly to the insurance company as it does to the lender. It depends upon the facts, Your Honor, but you're absolutely right that the insurance company can, above the board, pass on benefits in order to get the business as long as that's passed on to the ultimate consumer because what we're ultimately enforcing is a contract, a mortgage, about the cost of insurance, Your Honor. So the primary wrongdoer is the mortgage. Would it be fair to describe it as a referral fee? I mean, what's going on here is the insurance company is giving a referral fee back to the lender. I know you call it a kickback. Let them make it a kickback. It's really a referral fee. Would it be fair to call that? That's what the insurance company is doing? I'm not sure. You're referring us business. What I would call it, Your Honor, is a side agreement because a referral fee, to me, Your Honor, gives it too much of an aura of legitimacy. I want to make sure I understand the transaction because, of course, the lender doesn't know who's going to not buy insurance. Okay? The lender doesn't know for sure what mortgagees, I mean, what people are going to not buy insurance. So it has a master policy, right? Yes, Your Honor. So it covers all of its loan portfolio because, A, maybe the person that doesn't pay, or it might be B, it might be C, but they know some percentage are not going to pay, right? And they're going to have to place the insurance. Is that kind of how it works? Yes, Your Honor. Okay. And so what they do is they get an arrangement with an insurance company. Go cover everybody. That's what they're doing, really. All of their loans would be covered. Would that be correct? Their entire portfolio is covered. And so that when they have a homeowner, borrower, not pay, they then force place the insurance and charge back the borrower. Although there's continuous coverage. Yes, Your Honor. Yes. Well, because they want their interest protected, their collateral protected. That's right. Right. And the contract, you mentioned contract. The contract gives the borrower notice that it's going to cost you more if we place it ourselves. But it will be cost of insurance, Your Honor. Well, it says force place insurance, and it will cost you more. The language of the mortgage does not say force place insurance, but that is the effect. And it says it may cost you more, may not cost you more. But the issue is not that it may or may not cost you more. I understand the issues about the referral fee that's paid back that you want to recover. Yes, Your Honor. But I don't understand why all of this isn't just the cost of the lenders doing business here. They're paying for the policy, and it's just a business transaction. But it's not the cost of business. They call it a commission when they don't earn it. So basically it's just giving them cash. And then they have services that are core obligations of the servicer, and they're not performing them. And then they also have reinsurance programs when they're – The lender is providing a great deal of business to the insurance company. That's true, Your Honor. Is that not a service to the insurance company? The lender is referring all this business to the insurance company. That's not a service to the insurance company for the referral fee? Well, no. The lender is simply giving their business to the insurance company, and they're not referring some other entity's business. All right. You've answered my questions. Thank you. I apologize if I didn't follow, Your Honor. But the fact of the matter is – That's probably a defect in the question, not in your answer. But you've reserved your full five. Thank you, Your Honor. I would just leave you with the fact that we're here on a pleading, and it has been thrown out in that circumstance. It would be an issue of fact about the nature of the payment. Thank you, Your Honor. Mr. Burke? Your Honor, thank you. The plaintiff's kickback claims here fail for multiple reasons. We articulate all of them in our briefing, but especially through the application of the filed rate doctrine.  All right. Let's say that the facts are as alleged, except that the lender decides, because it thinks that it's going to be able to garner business in the future from this lender. The insurance company decides, you know what, for year 2017, we're going to give them back 100% rebate on their policy. Well, that's – No. I mean, keep going. Sorry. All right. So let's say that a policy – let's say that – let's use round numbers, even though they may not affect real reality. Let's say that a master policy in this scenario is going to cost a lender for its portfolio a million dollars. And let's say that the insurance company says – and those are approved rates. And the insurance company's board of directors gets together and says, you know, this insurance company, this lender's going to be coming back year after year with a lot of business. You know, I bet you that we're going to keep getting that business if we give them back a rebate. Let's give them a rebate of 50%. And some board members say, why not 75%? And some say 100%. And at the end of the day, they give them back 100% of the premium. The lender then charges the borrower the amount when he or she does not obtain insurance. Is that kosher? All right. Let me just first clarify. What is paid, by the way, is not a rebate. It's a commission to a licensed agency affiliate. Not in my hypothetical. Well, I have to explain that the regulator decides what that commission will be. Not in my hypothetical. Well, but that's why the – The rate is this. The insurance company says, for this master plan, master policy, with this many policies and this much in outstanding loan obligations, I am going to charge lender X this amount of money. And the regulators say, approved. You can charge for that portfolio a million dollars a year. Okay? Okay. After they get the million dollars back, the million-dollar premium paid, they give it all right back to the lender. It's a hypothetical. It's not this case. Okay. I want you to take the hypothetical and its alleged facts on their face. When all that money is given back to the lender and someone doesn't obtain insurance, they get lender-placed insurance through the master plan, but there's no real cost to the lender because they've gotten their premium completely back. Can they charge the borrower the amount that would have been charged to the lender had the full premium of a million dollars been paid and accepted? Two points. First of all, that would be an unlawful rebate, which you've just articulated as your hypothet, and therefore it would be precluded as a matter of law under Florida law or Pennsylvania law. Would it be protected by the filed rate doctrine? If it had happened that the regulators approved that arrangement, then the filed rate doctrine would preclude independent claims because the filed rate doctrine, it would violate the non-justice ability clause. No. Why isn't that a breach of contract claim when you are charging the borrower, in my hypothetical, for a cost that you never expended? The contract says if you don't get insurance, we're going to force-place insurance, and it's going to be higher than you would otherwise be able to get. So the borrower understands if they don't get hazard insurance and they were paying, let's say, $5,000 a year, they might have to pay $8,000 a year. Completely understood. But if the economic reality is that the lender is paying zero for force-place, in my hypothetical, for force-place insurance, doesn't the borrower have a contractual claim against the lender for charging them something the lender didn't have to pay out? Okay. First of all, in your hypothet, we don't have those parties before the court. What we have are loan insurers. It's a hypothetical. I understand that. Okay. All right. Well, the answer would be no. There would be no claim because the NBank opinion in TAFIT says that the plaintiffs would suffer no cognizable injury by paying the filed and approved rate. Their injury is that they are paying a cost that the lender never had to expend. It wouldn't matter because the rate payer, the person, the homeowner is paying. No, that's not the rate payer. The rate payer is the lender. Well, I disagree with you, Your Honor. Who gets approved? Who are the two parties when a rate gets sent to the regulators? Who are the two parties? The insurance company and the lender who's paying the rate, correct? Incorrect. This is a hybrid product. This whole not-rate-payer argument, it just makes no sense at all in the context of this product. These are dual-interest products, meaning they cover both the lender and the borrower's interest in the underlying property. Borrowers make tens of millions of dollars in claims every single year. In fact, all around the country, it's billions of dollars in claims every single year on these policies. So this isn't just insuring the lender. It insures the borrower's interest in the property as well. And, of course, the Second Circuit said in Brodsky— This depends, right. Some people might have— Might, might not, yeah. Right, exactly. So that's why they have to cover everybody's interest. And, of course, the Second Circuit said in Rothstein the very same thing that this court has said in Hill, which is that the application of the filed-rate doctrine doesn't depend on whether the premium is paid through an intermediary at all. But what if it's not paid at all? Well, even if it weren't paid at all, in your hypothet, the regulator would have approved it, and the whole idea of the non-justice ability strand is to keep the courts out of rate-making. This is not rate-making. It's just whether or not you're charging for a cost that you didn't expend. No one's challenging the rate. Well, from the insurer's perspective, which is whom I represent, we are filing our rates, and we're being paid the filed rate. And what's happening is that the lender— By the insurance—by the lender. By the lender, but immediately it's all done with a computer program. The premium is immediately then charged to the borrower. Well, no, not immediately. It's whenever there's a deficiency or a violation. Well, I mean in the sense that when the premium is paid by the loan servicer to the insurer, then it is an instantaneous charge to the— But I thought it's a master—I thought it's a master— Tell me about the practical realities of how this works. Oh, okay. If it's a master policy, aren't you paying a general premium? No. No, tell me how that works. No. A group master policy is issued in many states. There are five or six states where individual policies have to be issued, like in New York. But a group master policy is issued, and then a certificate of insurance for every single property that is insured is issued covering the interest of both the borrower and the lender. And that rate is presumably on some type of a per-value basis. It is. That is—that's what's approved by the regulator. Exactly. Exactly. It's per $100 of, you know, covered value. So the borrower, by pass-through, is paying the amount that the regulator has said the product is worth. Exactly. Now, in Judge Jordan's hypothetical, they are getting whatever you call it, a kickback, a commission, that, you know, might be tickets to a football game, might be a trip to Las Vegas, or it might be cash. Now, you said, I heard you, if I heard you right, that you want to call it a commission, because that sounds nicer. Well, that's what it was. But then you said the regulator decides the commission. Is that correct? That is correct. And how so? Well, when you make a rate filing, you add commission loads, all kinds of loads for various types of expenses and so forth. These are expense elements of the filed rate. And the regulator approves that commission load. Well, they don't set it, then they approve it. But they're not the ones who set it. Oh, no. There's a big interchange in every rate filing. There are proceedings, hearings. But is what you're saying that any of the things that they're complaining about are in those loads that are approved by the commission or that are filed with the commission? Exactly right, Your Honor. So that these are not trips to Las Vegas or tickets to football games on the side? No, no. That's your position, at least. These are elements that were in the filed rate and approved by the regulator. And, by the way, it is a commission paid to a licensed agency. The licensed agency is owned by the loan servicer. So they have to step that third party right? You're saying it's an insurance agency? Yes. An agent? Yes. That's exactly what this is. But that has another entity involved here? That is correct. But it's an affiliate of the insurer. It's an affiliate or related to the insurer. No. It's an affiliate related to the loan servicer. Okay. So you've got a lender, you've got a loan servicer. And you have a licensed agency which happens to be owned by Caliber or SLS. So they just step it together and say, Oh, we're paying Caliber or SLS the rebate. But there's no rebate here. This is a commission that has been set by the regulators. So what is the commission here on these policies? Is it 3%? No, it varies. What is the range? Between 11% and 15%, which is very comparable to what is approved on any regular homeowner's policy. Let me ask you a different version of the hypothetical. If the lender never pays the premium for forced place insurance, can that be passed on to the borrower? No, because there's no coverage. If the lender doesn't pay. No, no. And you get coverage. You just don't make the payment. Well, no, we wouldn't issue the policy. The regulators won't let you do that. No, it's not the regulators. The insurance company makes a mistake. Well, rarely would that happen. And if it did happen, then it would be that canceled. You have to accept the corner I'm trying to paint you into. Okay? That's just the way it works. Okay. So if a mistake happens and the lender tells the insurance company or the insurance company knows who's doing the servicing, right, that this homeowner has not gotten hazard insurance and they now need forced place insurance, the insurance company issues the policy and forces the insurance, but they make some mistake and they never charge the lender the premium, the lender then tells the borrower, we're adding that premium to your principle. Does the borrower in that circumstance have a claim that is not barred by the filed rate doctrine? Yes, because there wouldn't be here's the issue. So the amount that's collected matters. It does because only it's on each individual property is the premium calculated and charged and paid by the servicer and then passed on to the borrower. And that's why when we're talking about the kickbacks, the so-called kickbacks, we're talking about commission loads and certain other expense loads that these plaintiffs just don't happen to like. But they've already been reviewed and approved by the regulators. So that's why it would undermine and subvert the authority of the regulators to decide what particular component should be included in a viable and appropriate rate. Their claims would just completely subvert it. That's exactly what Rothstein held. I have one more question, a more and more practical question about how this rate making works. Whether you call them commissions, kickbacks, referral fees, whatever, are they on a per policy basis? Yes. Or on a portfolio basis? No, no. It's a group master policy, but there's no coverage until the individual certificate is issued on an individual property. Okay. And how does the regulator know ahead of time what commission rate is appropriate for a policy that hasn't been forced yet? Because in a rate filing, it's all prospective. All rate making is prospective. And so the actuary is put together, and it's from zero. So it's like, okay, the expenses of administration will be this. The expenses for commissions, what are known as acquisition costs, will be this. And it all adds up, and then that is the rate that the regulator approves. And what these plaintiffs want to do is say, oh, let's take some of those components of the approved rate, and we want to have those as damages. Well, you just can't do that. That undermines the entire rate making process. That's why the filed rate doctrine bars their claims. But with regard to the percentage that is the commission or acquisition cost or whatever you want to call it, sometimes insurance is $10 per 1,000 or something. Is there a way you can quantify it? I'm talking about the coverage itself. Yes. The rate is so much per 1,000. How is the rate calculated? Exactly. It's so much per $100 of, you know. You base it on the person's last known coverage amount, because that was developed by that person and their agent on a voluntary basis. What I'm trying to get at is their one number, when you say the file rate doctrine and the file rate, I know there are components to that, but at the end of the day, is there just a flat number per 1,000 or so forth? Yes. It would be like $1.90 per $100 or something like that of value on the value of the home. Okay. Actually, the improvements to the home, not the land, of course. So the commission part is not broken out separately. Not in each. Not in the rate. Exactly. The regulators, because it's sometimes, you know. It's a component, but it's not. That's why you say 11% to 15%, depending on. Yes, Your Honor. But it's an identifiable component of the rate is what you're saying. That's right, because the insurer has maybe 30 or 40 programs, and each of those programs will have an individually negotiated commission with a licensed agent. And those run from 11% to 15% in that range. So that's why. What they're challenging is something that's just an integral component of the filed and approved rate. That's why you can't get the courts involved in that rate making. That's exactly what the non-justice. Well, it would be no different than they say there. Administrative costs of making the loan for the people is administrative costs overhead of the lender is 20%, let's say. I suppose they didn't spend 20%. Right. I mean, it turned out this year they let off some people, and they didn't actually spend 20%. Right. On that component. And then what happens is. That went into the rate. That's right. And then what happens is that the rate is then refiled every couple of years. Yeah, right. And takes that into account, the experience. Right. Okay. You've exhausted your time, and we'll hear from Mr. Kemp. All right. Thank you. We let him go seven minutes over, but you did go five minutes over, so I guess we're somewhat even. But you still have your full five, Mr. Ronzelli. Mr. Kemp, you have five. Good morning, Your Honors. Eric Kemp for Caliber Home Loans. May it please the Court. I certainly join in Mr. Burt's comments. I had a few other points that I wanted to emphasize. The first is that plaintiffs have continuously argued that their claims in this case are based on defendant's conduct, as opposed to a challenge to the rates themselves. But under this circuit's precedent in both the Hill and the Taffet cases, that's a distinction without a difference. It's the impact that the plaintiff's claims will have on rate-making procedures and agency procedures, not how it's framed, that determines whether or not the doctrine applies. And in this case, there would be no way to determine the amount of the alleged kickbacks without reviewing the components of each rate, which would violate the non-justiciability principle. And if the Court were to grant the relief plaintiffs seek, which would effectively reduce the rate that they would pay, that would lead to them paying different rates than other ASIC insureds, thus violating the non-discrimination principle as well. Not if you have a class action. You'd have to pay everybody back. Well, not necessarily, Your Honor, because ASIC only has one policy for each servicer that uses the type of product. So even if you had everyone in a caliber class action get the same rebate on the rate, you have Bank of America, Wells Fargo, other loan servicers out there that use the same policy, and those borrowers would end up paying more, even though it's the exact same insurance product. That happens in law all the time. Groups of people sue. Other groups of people decide not to sue. At the end of the day, they're treated differently depending on what legal options they've exercised or not. Why is that problematic? It's problematic in this context because under the filed rate doctrine, the non-discrimination principle mandates that all borrowers pay the same rate. And if you have a situation where the rate that the borrower pays for a product turns on whether or not the borrower was involved in a certain class action or had his or her loan serviced by a certain servicer, you run afoul of that rule. That can't be the rule, though, because if you had a case where the filed rate doctrine absolutely did not apply, the fact that only one set of consumers filed suit doesn't mean that you say the filed rate doctrine does apply. That's crazy. No, the question is, does the filed rate doctrine apply or not? The statement Judge Jordan just made was that if you look at a case where it doesn't apply, but the issue here is, for example, I have a rate from a utility and I think you've done something evil and I sue and I win, then I'll be paying less than the guy who is in some other customer. That's correct. Even if it's a class action, as the Rothstein Court recognized, if there are other customers who are not bound by that class action, you still run afoul of the non-discrimination law. If I sued on behalf of all of the customers in Miami-Dade County, but FP&L also serviced Brower and Palm Beach, you'd have that same problem. That's correct. Another point I wanted to emphasize, Your Honors, is that plaintiffs have repeatedly made the case that these are commercial policies that protect supposedly only the servicer. That isn't correct. These are dual interest policies that protect both the servicer and the borrower. Borrowers can make claims under forced place insurance policies. And it is contemplated at all times that these rates will ultimately be to the borrower. There's information on the Florida Office of Insurance Regulations website that contemplates that the rates will be passed through. The certificates of insurance, which are approved by the regulators, contemplate that the rates will be passed through. And the borrower's mortgages also authorize the servicer to charge for the expense of the policy. Do you agree with Mr. Burt that you can only pass through what you pay? I agree that you can pass through the expense of the policy under the mortgage. Only if you pay it, though. In other words, if you, in my hypothetical, where a mistake is made and the lender never pays for the insurance, yet a policy gets issued, you can't pass that expense through, right? I would agree that if there was no payment at all under that hypothetical, that you couldn't pass that expense through. So whatever the company pays matters. Whatever the lender pays matters, at least in some circumstances, right? It might matter in that hypothetical, but, again, that's not the case we have here. I know. I know. Finally, Your Honor, the plaintiffs are relying on the Alston case. I think that that case is very easily distinguishable because you had a which provided a right to damages of three times the amount of the settlement charge without regard to the amount of the alleged kickbacks. Why should that matter if the filed rate doctrine doesn't even allow those sorts of challenges? I mean, your claim is that the filed rate doctrine supersedes federal and state law causes of action. If that's correct, why is that rationale? Even a problem. It does supersede federal and state causes of action. The issue in that case was that there was no need. And that's not a way for distinguishing that case. Because if the filed rate doctrine applies as broadly as you say, it should have trumped RESPA. Right? It would trump RESPA if the claims called for the court to violate either the Justiciability strand. Then it doesn't matter what RESPA provided at all. If it violated one of those strands, no, it wouldn't matter. But the distinction with the Alston case is that it didn't violate either strand because you had this unique remedy that provided three times the amount of the settlement charge. So there was no need to parse the rate. Why does that matter? I don't understand that at all. If you're getting money back and part of the money you're getting back is based on the alleged kickback or whatever you want to call it, how does that not fly in the face of the filed rate doctrine as you interpret it? I'm distinguishing the Alston case because there you would not. And I'm suggesting to you that's not a proper basis for distinguishing the case given your view of the filed rate doctrine. In other words, the way that you and Mr. Burt view the filed rate doctrine, it doesn't matter what remedies RESPA provided. That's irrelevant. If you're trying to get back something that regulators approved, whether you call it a commission, a kickback, or a referral fee, that's the end of the matter. It doesn't matter whether Congress provided for treble damages on certain types of fees. It doesn't matter at all and shouldn't and couldn't. Is that not right? I think that that's incorrect, Your Honor. As the district court found, Alston didn't raise a true filed rate issue because of that unique remedy. You didn't have to look at the settlement charge and see what the component of the alleged kickback was. You just got triple the full amount of the settlement charge. So there was no need to parse the rates. But isn't the settlement charge part of the approved rate? It is the entire rate. Of course. You're challenging the rate. Yes. But that's under your view of the filed rate doctrine. Not in a way that would run afoul of the non-judiciability or non-discrimination strand. How? I don't understand that at all. I think if you look at the Third Circuit's later cases on this issue, the New Jersey title insurance case and the McCrae case, in those cases when there wasn't this unique provision under RESPA giving the triple damage award, the court went through and did the non-discrimination analysis, did the non-judiciability analysis, and actually cited the Second Circuit's decision in Marcus in holding that those claims were barred. Okay. Thank you. Thank you. Mr. Ronzetti. Before you start, help me with our precedent because I don't think we write on a clean slate here. We have Tafet, we have Hill. Are you familiar with the forced flood case of Fiez, Wells Fargo? Yes, Your Honor. I realize they're dicta because it's an electrical case, it's a forced flood. I realize they're dicta, but they have strong statements in them that under the file rate doctrine, these types of so-called fraud claims don't survive. That's why . . . As long as you're charging the full rate. There's no other allegations above the file rate. Those cases all say these fraud claims don't survive. That's why the question is whether the file rate doctrine should apply, Your Honor. Okay. It's very regulatory environment specific. Okay. You're saying the difference is that it's because this isn't a utility, this isn't an insurance, but you had forced flood. There they were paying different amounts. Yes. The borrower there was paying for $63,000 of insurance. When the lender forced placed the flood, they did like $200,000 worth of insurance. Fiez, Your Honor, wasn't really . . . That was a forced flood insurance. How do you distinguish that one? Fiez, Your Honor, was not really a filed rate doctrine case. The issue in that case was, can the lender have insurance of an amount over the loan amount? Right. It had nothing to do with the allegations of this case where we're saying there were charges to us that violated our contracts. It was basically a question of contract interpretation. Yeah, but there was a lot of discussion in Fiez. The borrower's been put on notice that under the contract, the charges are going to be higher. However, they relied heavily on the notice to the borrower in the contract that under forced insurance, the charges are going to be higher. But, Your Honor, what the case ultimately relied upon in Fiez was the National Flood Insurance Program, which has national rates, and the question of whether there can be over-insurance beyond the loan amount. Right. And the borrower there alleged, you can only charge me up to my loan amount because that's all the flood insurance I want. And the court said, well, you were warned there might be charges beyond that. But there was no question about the legitimacy of any of those charges, Your Honor. It's totally different from our case. We're saying there were charges that were illegitimate and violated our mortgages. And the notices that they pointed to all occurred after the fact. They were after we had our contract. Let me ask you this hypothetical. Let's assume this lender went and placed this insurance with a real estate, I mean an insurance agency, okay, and they gave them a discount on the policy. That is, they bought it for less than the file rate, okay, but yet they charged the full amount to your client. Would you still make a claim here? The lender was charged less than? They went to a third-party, arm's-length insurance agency. They bought this, but they gave them a discount on it. But it was, and they didn't pay the full amount, but they got a discount on it. You would still claim? That is both a violation of the mortgage and the file rate doctrine would not prevent.  They were not paying the file rate themselves, and that's our allegation here. Judge Jordan was talking about the economic realities of it. We're here on a motion to dismiss a pleading. We pled very clearly that the economic reality is these rate payers, indisputably they're the rate payers. They're the ones who are obliged to pay it. They talked about the Florida website. It says that lender place coverage is coverage that a mortgage lender or a bank purchases the property it owns to protect its interests. They're the rate payers. And if, in fact, they're not paying that because of the economic reality of the situation, Your Honor, there's a cause of action there. And, again, we have to look at the regulatory regime. And the cause of action is basically what you claim is state law claims. We have state law claims and we have a— Of misrepresentation. They're fraud, basically. They sound in contract, Your Honor. It's the same as violating the mortgage agreement. And then they sound also in fraud and RICO. And Judge Boggs was— You made a RICO claim too? We did assert a RICO claim, Your Honor. Judge Boggs was referring to the issue about equity. And opposing counsel said, hey, there's a benefit to the borrower too. That is incorrect, Your Honor. Only to a limited degree is there a benefit. And it's only because the owner, the borrower, owns this security, this collateral. The lender place insurance is for the outstanding loan amount. So Judge Boggs, if, in fact, that occurs, if there's lender place insurance and there is damage to the house that well exceeds that, the money can go straight to the pocket of the lender and no benefit whatsoever goes to the borrower. And that happens all the time. Let's say you have an elderly couple. They've got a very small loan amount left in their property, and then their house is wiped out by disaster. That types of things happen. Under the mortgage, they can say, look, it's economically infeasible for us to build a house again. We're just going to take that money, pay off your loan, and here you go. You have nothing. And that's what happens. Because what they're protecting is their own economic interests. And to say that this is equally to the borrower, it's simply false, Your Honor. Why is it a commission, as he alleges? I use referral fee. First of all, are commissions allowed to be paid under the file rate doctrine? The answer has got to be yes. I'm sorry, Your Honor. Are commissions allowed to be paid under the file rate? If it were a legitimate commission, Your Honor. Why is this not a commission, then, that they are placing the insurance? They said they've got a captive, it must be a subsidiary or whatever it is, insurance, and they're running this through that subsidiary. They do absolutely nothing to earn a commission. I'm not saying they're doing a lot to earn the commission, but it is a commission that's paid to the loan servicer. Is that not correct? In only a fictional sense, Your Honor, because when you do nothing to earn a commission, the policy already exists. It's applied automatically. A lot of time when you have repeat business, by the time you have the 10th business, you aren't doing anything. They're just buying it from you. I mean, this is repeat business, correct? No, Your Honor. It's a master policy where, in fact, there are charges that arise, and they're supposed to be passing down the cost, only the cost of it. It's not a profit center. So whether this is a commission or not, you do agree that under the file rate doctrine commissions are allowed to be paid. That was part of his argument. You said this is not a legitimate commission. Yes, Your Honor. I would agree that a legitimate commission would be charged. So this is not a commission because you're saying they didn't take any conduct other than passing the paper through. They did nothing. It occurred automatically. They have electronic systems, and so the forced insurance is placed, and this entity gets a commission. Isn't that what's really going on? The forced insurance is charged to the borrower, and they're taking that money, and they're sending part of it to the insurance company and part of it to their subsidiary. They're pocketing part of it. I understand that, but it's not the lender. It is some entity. He called it some kind of licensed insurance agent. That's how I understood it. Is that incorrect? Did he misrepresent that? Well, first, Your Honor. Sir, did he misrepresent that, or you don't know? Frankly, Your Honor, we're on a pleading, so I really don't know. But I've seen in other cases, because we've litigated 29 of these or many of them and settled many of them, the economic reality, looking at the economic reality, that is a pass-through. They do nothing for that money, and they've created other programs, and they do nothing for the money. That's another issue. But you don't dispute the fact that what they're doing is they're taking the charge to the borrower, and they're dividing. Part of it goes to the insurance company, and part of it goes to some other entity that did nothing. Yes, Your Honor. That's what happened? That's right. What is this other entity that did nothing? You know what it is. I'll look at the pleadings and see if there's enough there. Well, there's nothing in the pleadings about it. This is something they put into the record. But it's an affiliated entity that is basically a way for them to have an additional profit center. All right, and how did they put it into this record? In the district court on the motion dismissed, did they attach something? Yes. There was some evidence that got put in in the district court that nobody disputes. Is that not correct? They didn't notice the font. Well, frankly, Your Honor, we'd like to take discovery on it. Well, but did you move to strike it? It was put in the evidence in the district court. Is that correct? What we tried to do, Your Honor, was to put in our own evidence to meet it and to try to take discovery on it, and it wasn't permitted. Well, what was their evidence that they presented that was considered by the district court? I cannot cite it, but I believe so, Your Honor. Okay. You've answered my questions. Let's see if my colleagues have any questions in light of my questions. Thank you very much. I appreciate it. Thank you, Your Honor.